**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| BRANDON POWELL, | § | |
| | § | |
| PLAINTIFF | § | |
| | § | |
| V. | § | CIVIL ACTION NO. 5:26-CV-05102-FB-HJB |
| | § | |
| NATIONAL SKEET SHOOTING ASSOCIATION D/B/A | § | |
| NATIONAL SPORTING CLAYS ASSOCIATION, | § | |
| | § | |
| DEFENDANT | § | |

---

# PLAINTIFF'S FIRST AMENDED COMPLAINT

---

Plaintiff Brandon Powell files this First Amended Complaint against Defendant National Skeet Shooting Association, a Texas non-profit corporation doing business as the National Sporting Clays Association, and alleges as follows:

## I. NATURE OF THE ACTION

1. Sporting clays is a type of clay pigeon shooting. It is sometimes known as "golf with a shotgun" because it takes place on a course with different shooting stations.

2. Plaintiff Brandon Powell ("Powell") earns his living competing in, and coaching students for, sporting clays tournaments. He is among the most accomplished competitors the sport has produced.

3. On August 6, 2026, the Executive Council of Defendant National Skeet Shooting Association, doing business as the National Sporting Clays Association ("NSCA" or "Defendant"), suspended his membership for the remainder of 2026 and for an additional ten calendar years, barred him permanently from eligibility for any NSCA recognition team, barred him permanently from eligibility for the NSCA Hall of Fame, and placed him on lifetime disciplinary probation.

The stated basis was a mutual, verbal dispute among members of a single squad over three days of a regional tournament.

4. A member cannot enter an NSCA-sanctioned competition unless he is a member in good standing, and NSCA sanctions substantially all registered sporting clays competition in the United States. The August 6, 2026 ruling therefore does not merely discipline Powell. It ends his profession for the remainder of his competitive life and strips him permanently of honors that cannot be recreated after the fact.

5. NSCA's Rules and Regulations ("Rules") constitute a contract between NSCA and its members. NSCA did not administer that contract as written. It ratified a shoot-level disqualification imposed without the notice and opportunity to be heard its own rule requires. It accepted an unsigned protest that its rules require to be signed. It relied on thirteen witness statements and on information from the host club that it never disclosed to Powell, never summarized for him, and never permitted him to answer—even though it had told him in writing that the host club's materials would be forwarded to him so that he could respond. It reached back to conduct "over the last several years" that no timely complaint placed before it. It did not obtain statements from all of the witnesses Powell identified. And it imposed a career-ending sanction on Powell while imposing nothing at all on the squad member who, by the complainant's own account, used vulgar language toward Powell first and threw spent shells at him first.

6. This is not a quarrel with the technical application of a procedural rule. Powell was subjected to an adjudication in which he never learned the evidence against him, never confronted a witness, never appeared before the Executive Council that initially decided his case, and received no detailed reasoned decision — and the sanction that followed is grossly disproportionate to the

conduct properly before the Council and to the discipline NSCA imposes for comparable or worse conduct by others. Texas law does not insulate association action of that character from review.

7. Powell pursued NSCA's internal appeal, and it cured nothing. On September 24, 2026, the Officers of the National Skeet Shooting Association heard the appeal and Powell appeared and testified. He was still not permitted to confront or question any witness; no record or transcript was made; and the one-page decision issued the following day, September 25, 2026, announced only that the Officers had "unanimously affirmed" the Council. It states no findings. It does not identify a single incident the Officers found to have occurred. And it rests expressly, in part, on a ground never charged in the complaint Powell was called to answer — that this was "the third disciplinary matter the NSCA has had to address with [him] since May 2025." The suspension remained in force throughout the appeal, as NSCA's Rules provide it must. Powell's administrative remedies are now exhausted, and the September 25, 2026 decision states that it "is final."

8. NSCA's conduct also violates the federal antitrust laws. NSCA is the sole sanctioning body for registered competitive sporting clays in the United States. It possesses monopoly power over the sanctioning of registered competition, and no competitor may enter a registered event, hold a classification, earn a national ranking, qualify for a championship, or be selected to a national team outside its system. NSCA has coupled that power with membership and termination policies that reserve to it the unilateral right to end a member's career—on evidence never disclosed, without a hearing, without findings, without any requirement of proportionality or even-handedness, and subject only to an internal appeal that does not stay the sanction and that may increase it. Those policies are not self-regulation entitled to deference. They are the mechanism by which NSCA maintains its monopoly and by which NSCA, its member clubs, and

members who are Powell's direct competitors exclude a rival from the only market in which his services can be sold.

9. Powell seeks (a) damages for breach of contract; (b) threefold his damages, together with costs of suit and reasonable attorney's fees, under § 4 of the Clayton Act, 15 U.S.C. § 15, for NSCA's violations of §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2; (c) a declaration under 28 U.S.C. §§ 2201–2202 that the August 6, 2026 ruling is void and unenforceable because it was arbitrary, capricious, and fundamentally unfair, because it was taken in disregard of the Rules that govern NSCA's exercise of its disciplinary power, and because it was taken in furtherance of an unlawful restraint of trade; (d) preliminary and permanent injunctive relief restoring his membership in good standing, including injunctive relief under § 16 of the Clayton Act, 15 U.S.C. § 26; and (e) his attorney's fees and costs.

## II. Parties

10. Plaintiff Brandon Powell is an individual and a citizen of the State of Georgia, residing in Warner Robins, Houston County, Georgia.

11. Defendant National Skeet Shooting Association is a Texas non-profit membership corporation, chartered on or about March 26, 1984, with its principal place of business at 5931 Roft Road, San Antonio, Texas 78253, in Bexar County. Exhibit 1. The National Sporting Clays Association is a division of the National Skeet Shooting Association, through which the corporation governs and sanctions the sport of sporting clays in the United States. Exhibit 1, Article 10, p. 18; Article 2, p. 2. Defendant has appeared herein and may be served through counsel.

## III. Jurisdiction and Venue

12. This Court has subject-matter jurisdiction over Powell's federal antitrust claims under 28 U.S.C. §§ 1331 and 1337(a) and under §§ 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26. Those claims arise under §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2.

13. This Court also has subject-matter jurisdiction under 28 U.S.C. § 1332(a)(1). Powell is a citizen of the State of Georgia. Defendant is a Texas corporation with its principal place of business in Texas and is therefore a citizen of Texas. Complete diversity exists.

14. The matter in controversy exceeds $75,000, exclusive of interest and costs. The suspension bars Powell from the competition, coaching, sponsorship, and instruction income on which his livelihood depends for more than ten years, and it permanently extinguishes his eligibility for NSCA recognition teams and for the NSCA Hall of Fame. The object of this litigation — restoration of Powell's ability to earn his living in his profession — far exceeds the jurisdictional threshold.

15. The conduct challenged in this Complaint is in the flow of, and substantially affects, interstate commerce. NSCA sanctions registered sporting clays competition at member clubs located all around the country, sells memberships to residents of every State, and collects a fee on every target registered at a sanctioned event anywhere in the United States. Competitors travel across state lines to compete; entry fees, target fees, purses, options money, and prize money move across state lines; and the sponsorship, endorsement, product-supply, instruction, and appearance contracts that depend on NSCA membership are negotiated and performed across state lines. Powell is a citizen of Georgia who competed at the sanctioned event in Illinois described below, was entered in the sanctioned event in Wisconsin described below, and was suspended by an association in Texas.

16. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (c)(2) because Defendant resides in this District, and under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to Powell's claims occurred in this District, including the Executive Council's deliberation, its vote, and the issuance of the challenged ruling from Defendant's San Antonio headquarters. Venue for Powell's antitrust claims is also proper under § 12 of the Clayton Act, 15 U.S.C. § 22, because Defendant is a corporation that inhabits, is found in, and transacts business in this District.

## IV. Factual Allegations

### A. The NSCA, the NSCA membership contract, and the Rules that govern discipline.

17. NSCA is the body that sanctions competitive sporting clays in the United States. A sporting clays event at which scores are officially registered, applied to the national classification and ranking system, and used to determine eligibility for state, regional, and national championships and for national teams is an event sanctioned by NSCA. NSCA is affiliated with local clubs around the country. The clubs make money from hosting NSCA tournaments. The clubs have to bid on the NSCA shoots to be able to host them.

18. A shooter cannot enter an event sanctioned by NSCA unless he is an NSCA member in good standing. Exhibit 3, Rule VI-A-2-a., p. 27.

19. NSCA membership is not a matter of individual negotiation. NSCA drafts the terms, and an athlete who wishes to compete accepts them as written. Exhibit 2, Rule II-3, pp. 8-12; Exhibit 3, Rule IV-A & B, p. 8.

20. The NSCA Rules, together with the NSCA Governance Book and the Bylaws of the National Skeet Shooting Association, constitute a contract between NSCA and each of its

members. By paying dues and entering sanctioned competition, each member agrees to abide by those Rules, and NSCA in turn agrees to administer and enforce them as written.

21. The Rules set out a specific, mandatory procedure that NSCA must follow before it suspends, expels, or otherwise disciplines a member. Among other requirements, the Rules provide, in pertinent part:

> (a) A written complaint must be submitted to the NSCA Director or Executive Director "within thirty (30) days of the alleged violation," and "[t]he action of being disqualified from a shoot does not start disciplinary action" (Rule IV-D-2(g));
>
> (b) The complaint must identify the alleged violator, the date and location of the violation, a reasonably detailed description of the alleged violation, the names and addresses of all witnesses, and the complainant's signature (Rule IV-D-2(g)(i)–(v));
>
> (c) The Director or Executive Director "shall thoroughly investigate the allegations . . . by attempting to obtain written statements from all known witnesses" (Rule IV-D-2(k));
>
> (d) The Director or Executive Director must prepare a recommendation to the Executive Council that includes all evidence considered, a determination of whether the alleged violation occurred, and the recommended discipline (Rule IV-D-2(l)); and the Council's ruling must likewise state the evidence considered and a determination of whether the alleged violation occurred (Rule IV-D-2(n)); and
>
> (e) Before any shoot-level disqualification or expulsion, "Shoot management may disqualify or expel a member . . . after giving both parties (the party filing the complaint and the party complained of) an opportunity to be heard prior to disqualification or expulsion," and "a written record of the complaint, the response and the decision shall be forwarded to the NSCA Director" (Rule IV-F).

22. The Rules confer discretion on the Executive Council as to the choice of sanction. Rule IV-D-2(n) empowers the Council to "suspend or expel a member or to impose any other disciplinary action it deems appropriate." Rule IV-D-1 similarly recites that the Council may suspend, expel, or discipline a member for the violation of any NSCA rule or regulation. Rule II-3-f. of the Governance Book provides that "[a]n NSCA member may be suspended at any time in the discretion of the Executive Director, provided, however, that any suspended member will have a right to an appeal . . . ." Exhibit 2, p. 11. That discretion, however, is conferred only as to the

sanction to be imposed for a violation found through the procedure the Rules prescribe. Rule IV-D-1 states the general power whereas Rule IV-D-2 prescribes, in mandatory terms, the only procedure by which that power may be exercised.

23. The Executive Council's discretion is not unlimited. It must be exercised within, and not in derogation of, the mandatory procedures the Rules impose, and it is confined by the obligation to act reasonably, even-handedly, and in good faith — an obligation that carries particular weight here, where NSCA controls access to the profession by which its members earn a living and where its rules are offered on a take-it-or-leave-it basis.

24. By joining NSCA, a member agrees to abide by the Rules and to accept NSCA's official decisions interpreting and applying them. That undertaking is reciprocal and conditional. A member agrees to accept decisions reached under the Rules—he does not agree to accept decisions reached in disregard of them, and nothing in the Rules waives the procedures that Rule IV-D-2 makes mandatory or consents to discipline imposed without them.

**B. Powell's profession and the pecuniary value of NSCA membership.**

25. Powell is a professional sporting clays competitor and instructor. Competitive sporting clays is a commercial enterprise. At all times material to this Complaint before August 6, 2026, Powell was an NSCA member in good standing (NSCA Member No. 537260). He has earned two World Championship titles, two National Championship titles, two U.S. Open Championship titles, membership on fourteen United States teams, and scores of titles at individual competitions. Registered tournaments charge entry and target fees and award purses, options money, and prizes. Elite competitors derive income from tournament winnings and options; from sponsorship, endorsement, and product-supply contracts with firearm, ammunition, optic, and

apparel manufacturers; from paid instruction, clinics, and coaching; from appearance and demonstration fees; and from related media opportunities.

26. Every one of those income streams depends on membership in good standing and on competing successfully in NSCA-sanctioned events. Sponsors and manufacturers extend contracts by reference to NSCA classification, NSCA titles, and NSCA All-American standing. Students engage Powell for instruction because of his current competitive record. A competitor who cannot enter registered competition has no competitive record, no classification, and no standing to sell.

27. In 2025, Powell earned approximately $138,000 from tournament winnings, purses, and options; approximately $177,000 from sponsorship and endorsement agreements and product benefits; and approximately $86,000 from instruction, clinics, and coaching.

28. There is no alternative venue. Because NSCA sanctions substantially all registered sporting clays competition in the United States, and because membership in good standing is a prerequisite to entry, there is no other tour, circuit, or sanctioning body at which Powell can compete during the suspension. Unsanctioned club events and other shotgun disciplines produce no registered scores, no classification, no ranking, and no championship or team eligibility, and are not recognized by sponsors as competitive results. A competitor who is not in good standing with NSCA is also precluded from competing in competitions in other countries.

29. Membership therefore carries substantial pecuniary value, and its withdrawal works a correspondingly substantial pecuniary loss. Powell is 39 years old. A suspension running to January 1, 2037, consumes the remainder of his competitive career. The permanent bars on recognition-team and Hall of Fame eligibility extinguish honors that, once forgone, cannot be earned later.

**C. The 2026 North Central Regional Championship.**

30. From July 10 to July 12, 2026, NSCA sanctioned the North Central Regional Championship, hosted at Northbrook Sports Club ("Northbrook") in Hainesville, Lake County, Illinois. Powell competed in the Main Event. He was squadded with Todd Hitch, Jonathan Prince, Jared Rumer, and Cameron Hicks.

31. Over the three days, several members of the squad engaged in a mutual and escalating verbal dispute. The conduct ran in more than one direction. By the account of the complaining member himself, at one station Jonathan Prince used vulgar language toward Powell and threw his spent shells ("hulls") at Powell first; the same complaint describes profanity exchanged between multiple squad members and requests no action against Prince. A separate, unsigned protest submitted to Northbrook — which Powell believes, based on the description of the author's participation, was submitted by Cameron Hicks — accused Powell of the very hull-throwing conduct that others directed at Powell, on the same day and course.

32. On the first day of competition, Powell reported the developing conflict to shoot management and asked a shoot official, Brett Seibert, to accompany the squad the following day — consistent with the Rules' direction that members report violations they witness (NSCA Rules IV-C-8, II-A-1). At more than one station, other squad members entered the three-foot safety zone behind Powell while he was actively shooting and spoke to or near him in the stand, contrary to NSCA Rule II-A-16 and, at a Regional Championship, NSCA Rule VII-E-5. Powell repeatedly asked them to move back.

33. At the conclusion of the Main Event, Powell won a shoot-off for High Over All and was declared the champion of the North Central Regional.

**D. The shoot-level disqualification, imposed without notice or hearing.**

34. On information and belief, hours after Powell was declared champion, Northbrook disqualified both Powell and Cameron Hicks. Powell was not presented with any written complaint in advance of the disqualification and was given no opportunity to be heard before it was imposed. Rule IV-F permits shoot management to disqualify a member only "after giving both parties . . . an opportunity to be heard prior to disqualification or expulsion." On information and belief, no written record of the complaint, the response, and the decision was forwarded to the NSCA Director, as the same rule requires.

**E. The formal complaint and Powell's response.**

35. On or about July 12, 2026, Todd Hitch submitted a written complaint to NSCA concerning the events of the North Central Regional. Exhibit 4. The complaint was docketed as NSCA Formal Complaint #26-10. On July 14, 2026, Executive Director Michael Hampton, Jr. transmitted the complaint to Powell and advised that it would go to the NSCA Executive Council for review. It also advised Powell that Northbrook intended to provide additional information and promised that Powell would be given this information for review and to address in his response.

36. The Hitch complaint recited five incidents. See Exhibit 4. Although Rule IV-D-2(g) requires that a written complaint be submitted "within thirty (30) days of the alleged violation," the complaint's conclusion asked the Council to consider Powell's alleged conduct "over the last several years" and "what I believe to be a documented history" — allegations offered on belief rather than personal knowledge, and reaching conduct that no timely complaint had ever placed before the Council.

37. NSCA also treated an unsigned protest lodged at the Northbrook event as an additional complaint against Powell. Exhibit 5. Rule IV-D-2(g)(v) requires that a complaint bear the complainant's signature. The protest bore none, and NSCA acted on it anyway.

38. Powell timely submitted a signed written statement under Rule IV-D-2(j). See Exhibit 6. Powell included a short video clip with his response, which is not appended hereto but is described in his letter.

39. As Powell noted in his written response, none of the five described incidents concerned conduct directed at the complainant himself; they concerned Jared Rumer, Jonathan Prince, and Cameron Hicks. Powell acknowledged that the weekend involved mutual conflict and that his own conduct had not been perfect. He denied the allegation involving Jared Rumer. He explained that the hull-throwing and vulgar language at the disputed station were initiated by another squad member and were understood by both as non-hostile. He identified the safety-zone and communication-rule violations committed against him. He noted that he had reported the conflict to shoot management before it escalated. He identified numerous witnesses — including a disinterested spectator, Brett Turrentine — and asked expressly that signed statements be obtained from all of them, as Rule IV-D-2(k) requires. He asked, in the alternative, that any discipline be proportionate to a mutual, three-day verbal dispute already addressed by disqualification.

**F. The Executive Council's August 6, 2026 ruling.**

40. On August 5, 2026, the Executive Council met. As set out in its letter communicating the decision to Powell, the Executive Council:

> reviewed the [Hitch] complaint, your response, information from the Northbrook Sports Club, and the witness statements of Cameron Hicks, Jonathan Prince, James Brody, Enzo Di Giovanni, Brett Turrentine, Tiffany Goodin, Brett Seibert, Jared

> Rumer, Michael Luongo, Jr., Scott Hitch, Julianne Hitch, Gary Fitzjarrell, and Sammy McFaddin.

Exhibit 7.

41. Powell never saw that evidence. Before its deliberations, the Executive Council did not give Powell copies of the information from Northbrook or the witness statements of Cameron Hicks (unless Exhibit 5 proves to have been written by him), Jonathan Prince, James Brody, Enzo Di Giovanni, Brett Seibert, Jared Rumer, Michael Luongo, Jr., Scott Hitch, Julianne Hitch, Gary Fitzjarrell, or Sammy McFaddin. Powell was never told what those witnesses said, was never given an opportunity to respond to any of it, and was never permitted to question any of them. He did not appear before the Council. No hearing of any kind was held. No record or transcript exists.

42. NSCA did not keep its promise nor follow its own rules. Although the Executive Council expressly reviewed "information from the Northbrook Sports Club," no copy of that information was ever forwarded to Powell, before his response was due, before the Council ruled, or before the Officers affirmed.

43. The August 6, 2026 letter recited that:

> Your actions on July 10, 2026, July 11, 2026, and July 12, 2026 were violations of the NSCA's rules and conduct, which provide in pertinent part that "[i]t shall be a violation of these rules to . . . (1) Exhibit unsportsmanlike conduct of any kind, including but not limited to . . . cheating, swearing, verbal or physical abuse of any shooter, scorer, field judge, shoot official or protest committee . . . (7) Exhibit any conduct that is harmful to the NSCA, its membership, or the sport as a whole." See NSCA rules IV-C-1, IV-C-7.[1]

Exhibit 7.

44. The ruling did not identify which of the five alleged incidents the Council found to have occurred, which it rejected, what evidence it credited or discredited, how it resolved the

[1] The letter also noted that Powell had been subject to other discipline in 2025, although the probation imposed in one prior case ended April 28, 2026. NSCA later made that prior history an express element of its decision on appeal. See ¶ 57 below.

conflict between the complainant's account and Powell's, or why the sanction it selected followed from the facts it found. Rule IV-D-2(n) requires that the Council's ruling state the evidence considered and a determination of whether the alleged violation occurred.

45. The August 6 letter imposed the following discipline:

(a) the Northbrook disqualification would stand;

(b) Powell's NSCA membership was suspended for the remainder of 2026 and for a period of ten additional calendar years, effective August 6, 2026;

(c) he could not re-apply for membership until after January 1, 2037, and NSCA would not be obligated to accept any application;

(d) if reinstated, he would be subject to lifetime disciplinary probation;

(e) he was permanently disqualified from eligibility for any NSCA recognition team, including the USA Sporting Clays Team and the NSCA FITASC Team; and

(f) he was permanently disqualified from eligibility for nomination to or induction into the NSCA Hall of Fame.

46. The August 6 letter recited that, "while a lifetime ban . . . was considered," the Council "stopped short of imposing a lifetime ban." In substance it did not. A suspension of more than ten years, coupled with permanent disqualification from recognition teams and the Hall of Fame and lifetime probation, is a lifetime ban for a 39-year-old professional competitor.

**G. The disparity in treatment.**

47. The Council imposed no discipline whatever on Jonathan Prince, who by the complainant's own account used vulgar language toward Powell first and threw hulls at Powell first; none on Jared Rumer; and none on the squad members who entered the safety zone behind Powell while he was shooting, in violation of NSCA Rules II-A-16 and VII-E-5. The complainant himself asked that no action be taken against Prince, and none was.

48. The conduct with which Powell was charged is conduct in which several members of the squad participated. NSCA singled out one participant — the competitor who had just won

the event — and ended his career, while leaving the others untouched. Nothing in the August 6 ruling explains that disparity.

49. On information and belief, NSCA has imposed materially lighter sanctions on other members for equal or more serious conduct, including conduct involving physical altercation, threats, cheating, and safety violations.

**H. The internal appeal and the September 25, 2026 affirmance.**

50. The Rules provide that a member may appeal to the NSSA Officers within twenty days, but that the suspension "will remain in effect throughout the appeal process." Any hearing on the appeal "will take place at the next regularly scheduled quarterly meeting of the NSSA Officers." The Rules further recite that decisions of the Executive Council following a hearing are "FINAL." Rule IV-E-4.

51. Powell timely noticed and prosecuted an appeal. As the Rules require, the suspension remained in effect throughout. It was in force on August 11, 2026, when the 2026 NSCA U.S. Open began, and it remained in force for the balance of the 2026 competitive season.

52. On September 24, 2026 — more than seven weeks after the sanction took effect — the NSSA Officers heard the appeal. Powell appeared in person and testified. By letter dated September 25, 2026, Executive Director Michael Hampton, Jr. advised that the Officers had "unanimously affirmed the disciplinary decision of the NSCA Executive Council" and that the decision "is final." Exhibit 8.

53. The appeal did not cure a single defect in the proceeding it reviewed. Powell was not permitted to confront, question, or cross-examine any witness against him. No witness against him appeared. No record or transcript of the hearing was made. And the decision that followed states no findings: it does not identify which of the five charged incidents the Officers found to

have occurred, what evidence they credited, how they resolved the conflicts between the accounts, or why a suspension of more than ten years and permanent exclusion from recognition teams and the Hall of Fame followed from whatever they found.

54. The September 25, 2026 letter observes that Powell "did not bring, or request that the NSSA Officers hear from, any additional witnesses" and "did not present any evidence other than [his] testimony." That observation describes a condition NSCA created. Powell could not examine adverse witnesses and the Officers were thus compelled to make judgments about conflicting testimony without ever being able to observe the accusers. He had already identified his witnesses by name in his written response and had asked expressly that signed statements be obtained from all of them. Exhibit 6. Rule IV-D-2(k) placed the duty to "thoroughly investigate the allegations . . . by attempting to obtain written statements from all known witnesses" on NSCA, not on the accused member. NSCA did not discharge that duty before the Council ruled, and it did not discharge it before the Officers affirmed. Nothing in the Rules, in the notice of the hearing, or in any communication Powell received advised him that he bore the burden of producing witnesses on appeal, or that the Officers would draw an inference against him if he did not

55. The September 25, 2026 letter also recites that Powell "agreed that [he] acted in an unsportsmanlike manner at the 2026 North Central Regional event at the Northbrook Sports Club." Powell does not retreat from that acknowledgment, and he made the same acknowledgment in his written response to the complaint. Exhibit 6. He acknowledged then, and acknowledges here, that the three-day dispute involved conduct on his part that fell below the standard the sport expects of him. That acknowledgment is not, and was not understood by anyone present to be, a concession of the specific allegations he had denied, a concession that his conduct was more culpable than

that of the squad members who used vulgar language toward him and threw spent shells at him first, or a concession that the sanction imposed was warranted.

56. The acknowledgment accordingly resolved nothing the Council had left unresolved. Powell conceded unsportsmanlike conduct in the abstract; the question the Rules required NSCA to decide was which alleged violations occurred, on what evidence, and what discipline those violations warranted as measured against the conduct of the other participants and against the discipline NSCA imposes on others. Rule IV-D-2(n). Neither the Council nor the Officers answered any part of that question. A general admission that some misconduct occurred cannot substitute for findings, and it cannot supply a justification for a sanction that neither body has ever explained.

57. The Officers rested their affirmance in part on a ground that was never charged. The September 25, 2026 letter states that the Officers acted "in consideration of the fact that this is the third disciplinary matter the NSCA has had to address with [Powell] since May 2025." Formal Complaint #26-10 charged conduct occurring on July 10, 11, and 12, 2026. It did not charge the prior matters. Powell was never given notice that the prior matters would be weighed on appeal, was never told what weight they would carry, and was given no opportunity to address them, to put them in context, or to contest their characterization. The probation imposed in one of those matters had expired on April 28, 2026, months before the North Central Regional.

58. The appeal thus produced the same result by the same means: a decision on evidence Powell never saw, reached by a body he could not question, resting in part on matters he was never charged with, and announced without findings. The only difference between the two proceedings is that Powell was permitted to speak at the second one before it confirmed the first.

**I. The consequences to Powell.**

59. The sanction took effect immediately on August 6, 2026, was not stayed at any point during the internal appeal, was affirmed in full on September 25, 2026, and remains in force today. By its terms it bars Powell from registered competition until January 1, 2037, and bars him from recognition teams and from the NSCA Hall of Fame permanently.

60. The harm the suspension threatened has begun to occur and continues. Powell was barred from the 2026 NSCA U.S. Open, which began August 11, 2026, in Hudson, Wisconsin. See https://www.2026nscausopen.com (official event site). The U.S. Open is one of NSCA's two most important events. That event has now passed, and the opportunity it represented cannot be restored by a later payment of money. Powell remains barred from every registered event remaining on the 2026 calendar and from the entire 2027 season and each season thereafter through 2036.

61. Powell's classification, national average, ranking, and All-American standing have been lost and continue to erode with each registered event he cannot enter. His eligibility for NSCA recognition teams and for the NSCA Hall of Fame — honors that remain permanently impacted as they turn on the outcome of a full career — has been permanently extinguished.

62. On July 16, 2026, following the North Central Regional and expressly "pending any and all disciplinary matters" before NSCA and others, a principal sponsor suspended Powell's sponsorship, suspended his contractual benefits and the accrual and use of his product points, and advised that permanent termination of the sponsorship under Section 2.2(b) of his sponsorship agreement is a "possible contingency" to be decided once the disciplinary matters conclude. Enforcement of the NSCA sanction thus directly threatens the permanent loss of Powell's principal sponsorship.

63. After the suspension Powell was told by one club that he could not put on a clinic. He was told by another club that he could continue to coach there but could not advertise his clinics. Powell was told that this advertising ban was due to the club's fear of NSCA pulling registered tournaments from the club.

64. Powell's professional reputation and goodwill — the foundation of his coaching, clinic, and sponsorship income — are being destroyed as the sanction is publicized and honored throughout the sport.

65. Because there is no alternative sanctioned venue in which Powell may compete, each competitive season lost during the suspension is lost permanently. The value of a peak competitive year in a finite athletic career, of a national title not contested, and of a Hall of Fame candidacy foreclosed cannot be measured in money. Powell has no adequate remedy at law for that portion of his injury.

**J. NSCA's monopoly power, and the membership and termination policies through which it is maintained.**

66. The relevant product market is the sanctioning of registered competitive sporting clays events in the United States—that is, the provision of the services without which a sporting clays event cannot produce an officially registered score, a national classification, a national average or ranking, eligibility for state, regional, and national championships, or eligibility for a national recognition team.

67. No other product is a reasonable substitute for that service. Unsanctioned club shoots, league play, and charity events produce no registered score, no classification, no ranking, and no championship or team eligibility. Other shotgun disciplines—including skeet, American trap, and bunker trap—are distinct sports with distinct target presentations, equipment, techniques, competitive calendars, classification systems, and sponsors, and a professional sporting clays

competitor cannot substitute into them without abandoning his profession and beginning another. Sponsors, manufacturers, event promoters, and paying students value NSCA classification, NSCA titles, and NSCA All-American standing, and do not treat results from unsanctioned events as substitutes for them. In response to a small but significant and non-transitory increase in NSCA's dues, registration fees, or per-target fees, or to a comparable worsening of its terms, a competitor could not and would not shift to any of these alternatives, because none of them supplies what NSCA sanctioning supplies.

68. The relevant geographic market is the United States. NSCA classification, national average, ranking, and All-American standing are national in scope; the championships and recognition teams to which they lead are national; the sponsors and manufacturers who contract by reference to them are national; and no foreign sanctioning body offers registered competition in the United States.

69. In addition, or in the alternative, a relevant market is the market for the services of professional competitive sporting clays athletes and instructors in the United States, in which competitors such as Powell sell their services to sponsors, manufacturers, event promoters, clubs, and paying students. Entry into that market is controlled entirely by NSCA, because the credentials on which the buyers of those services rely can be earned only in NSCA-sanctioned competition.

70. NSCA possesses monopoly power in the sanctioning market. On information and belief, NSCA sanctions substantially all of the registered sporting clays competition conducted in the United States. On information and belief, NSCA has over 22,000 individual members and over 600 affiliated member clubs, and registers approximately 35 million targets annually.

71. NSCA's power is also shown directly. It sets membership dues, event registration fees, and per-target fees unilaterally, without reference to the price or terms of any competing

sanctioning body, because there is none. It has not lost, and could not lose, material membership to a rival sanctioning organization. It alone determines who may enter registered competition in the United States, and no body outside NSCA reviews that determination.

72. Entry into the sanctioning market is barred or substantially impeded by, among other things: (a) network effects: a sanctioning body has value only if it already commands the shooters, the member clubs, the tournament calendar, and the recognition of sponsors, and no entrant can assemble those elements simultaneously; (b) NSCA's exclusive custody of the classification, average, ranking, and All-American records on which competitors' livelihoods depend, none of which is portable to a rival; (c) NSCA's affiliation structure with state associations and member clubs and its control of the national championship calendar; (d) NSCA's control of selection to the recognition teams that represent the United States in international competition; and (e) the fact that every member whose participation a rival sanctioning body would need is subject to NSCA's disciplinary power and may be suspended for conduct NSCA deems "harmful to the NSCA."

73. NSCA's membership terms are not negotiated. NSCA drafts them and offers them on a take-it-or-leave-it basis to athletes who must accept them or abandon the sport. Among the terms NSCA has imposed are the following, each of which enlarges its power to terminate a member's participation and removes a check on the exercise of that power: (a) suspension of any member "at any time in the discretion of the Executive Director" (Governance Book Rule II-3-f); (b) authority in the Executive Council to "suspend or expel a member or to impose any other disciplinary action it deems appropriate" (Rule IV-D-2(n)), with no grading of offenses, no presumptive or maximum sanction, and no requirement that the sanction bear any relationship to the conduct found or to sanctions imposed on others; (c) an open-ended offense reaching "any

conduct that is harmful to the NSCA, its membership, or the sport as a whole" (Rule IV-C-7), which by its terms extends to conduct adverse to the association's own institutional interests and thereby permits NSCA to terminate members who criticize it, who contest its rulings, or who support, organize, or compete in a rival sanctioning venture; (d) no requirement that an accused member be furnished the evidence, the witness statements, or any summary of them; (e) no right to a hearing, to appear before the deciding body, to confront or question any witness, or to any record or transcript; (f) an internal appeal that does not stay the sanction, that is heard only at the next quarterly meeting of the NSSA Officers, that affords no access to the evidence and no confrontation, and that expressly permits the punishment to be increased; and (g) a recitation that decisions of the Executive Council are "FINAL."

74. Administered by a monopolist that controls the only avenue into a profession, those terms are not internal housekeeping. They are the mechanism by which access to the market is granted and withdrawn, and they are administered without the procedural safeguards that would confine their use to legitimate ends.

75. NSCA is not a single economic actor. It is an association of independently owned member clubs and of individual members who are actual or potential competitors of one another. Member clubs compete with one another to host registered events and to attract shooters, entry fees, and target fees. Individual members, including the member who complained of Powell's conduct, the members whose statements the Executive Council received, and the NSSA Officers who heard and decided his appeal, compete with Powell and with each other for purses, options money, sponsorship and endorsement contracts, recognition-team places, national ranking, and paying students. The complaining member himself states in his complaint that he "earns a living competing and coaching in the shooting sports," and he asked NSCA to impose "the strongest

disciplinary action it deems appropriate, including the possibility of a lifetime ban." Exhibit 4. When NSCA adopts and enforces rules that exclude a member from registered competition, independent economic actors who would otherwise compete for those same rewards are acting in concert.

76. The Executive Council that suspended Powell is composed of representatives drawn from the membership.

77. The adoption and enforcement of the rules described above, the shoot-level disqualification imposed by Northbrook and ratified by NSCA, the August 6, 2026 ruling, and the unanimous affirmance of that ruling by the NSSA Officers on September 25, 2026 each reflect an agreement, combination, or concert of action among NSCA, its member clubs, and members who are Powell's competitors, to refuse to deal with Powell and to deny him access to registered competition. On information and belief, members who compete directly with Powell for purses, sponsorship, and recognition-team places solicited, procured, or supported his exclusion, and stood to gain from it.

78. The conduct described above harms competition generally, and not merely Powell specifically for at least the following reasons. First, it removes from the market an elite supplier of competitive and instructional services for more than a decade, reducing the output, quality, and variety of professional sporting clays competition and instruction available to clubs, event promoters, sponsors, spectators, and paying students, and awarding purses, sponsorship contracts, and recognition-team places to rivals by exclusion rather than on the merits. Second, it entrenches NSCA's monopoly by making the price of criticism, of contesting a ruling, or of association with any rival venture the loss of the member's profession, and so deters the member and club participation that a competing sanctioning body would require in order to enter. Third, it enables

NSCA to impose supracompetitive dues, registration fees, and per-target fees, and one-sided terms, on members and clubs who have no alternative and who cannot safely object. Fourth, it degrades the integrity of registered competition itself, because a power to end a competitor's career on undisclosed evidence, without a hearing and without findings, may be exercised for reasons unrelated to the conduct charged and cannot be tested by anyone. Fifth, it reduces the choices available to purchasers of professional sporting clays services, who are deprived of a supplier they demand for reasons unrelated to the price or quality of what he offers.

79. The exclusion of Powell serves no legitimate procompetitive purpose. NSCA's interests in safety, sportsmanship, and the integrity of competition are fully served by rules of conduct enforced through procedures that give notice of the charge, disclose the evidence, afford an opportunity to answer and to be heard, produce findings, and yield sanctions proportionate to the conduct found and even-handed as among the participants in it. NSCA's own Rules promise most of those safeguards. What is challenged here is not the existence of disciplinary rules but their administration in a manner that dispenses with every safeguard that would confine the exclusionary power to legitimate ends, and the availability of those safeguards as a substantially less restrictive alternative.

80. Powell's injury is antitrust injury. He has been excluded from the only market in which his services may be sold, by the entity that monopolizes access to it, at the instance of members who compete with him, through the exercise of a power whose absence of procedural constraint is what makes it unlawful. His loss of competition income, sponsorship and endorsement compensation, instruction and clinic income, appearance fees, and professional standing flows directly from the reduction in competition described above and is of the type the antitrust laws were enacted to prevent.

## V. CONDITIONS PRECEDENT AND EXHAUSTION

81. All conditions precedent to Powell's recovery have occurred, have been performed, or have been waived or excused. Fed. R. Civ. P. 9(c).

82. The Executive Council's ruling is final as to the determination it made. The Rules recite that decisions of the Executive Council are "FINAL." Rule IV-E-4.

83. Powell has exhausted every internal remedy NSCA provides. He noticed and prosecuted the appeal available under Rule IV-E, appeared and testified before the NSSA Officers on September 24, 2026, and received their decision on September 25, 2026. That decision affirmed the Executive Council in full and states on its face that it "is final." Exhibit 8. No further review exists within NSCA. Exhaustion presents no bar to any claim in this Complaint.

84. The adequacy of that internal remedy is therefore no longer a question of prediction. The appeal did not stay the sanction, and Powell lost the opportunity to compete in the 2026 U.S. Open and the balance of the season while it was pending. It gave him no access to the evidence against him, no confrontation, and no record. It produced no findings. And it added a ground — his prior disciplinary history — that he was never charged with and never given an opportunity to answer. The internal process has run its course and has produced no reviewable determination of anything.

85. Powell does not ask this Court to substitute its judgment for NSCA's on any matter committed to NSCA's reasonable discretion. He asks the Court to determine whether NSCA acted within the bounds of the contract it wrote and of the reason, common sense, and fairness that Texas law requires of it. Neither the internal-appeal provision nor the Rules' recitation that Council decisions are "FINAL" ousts this Court's authority to make that determination.

86. Exhaustion of NSCA's internal appeal is not a prerequisite to Powell's claims under the Sherman Act. Those claims do not arise from the association's contract, are not committed to the association's internal review, and cannot be redressed by it; NSCA's officers have no authority to award the relief the antitrust laws provide. In any event, for the reasons stated above, the internal appeal is inadequate.

## VI. Claims For Relief

87. Powell incorporates the foregoing paragraphs into each of the counts that follow as if fully set forth therein.

**COUNT I — Breach of Contract**

88. The Rules, the NSCA Governance Book, and the Bylaws of the National Skeet Shooting Association constitute a valid and binding contract between NSCA and Powell.

89. Powell performed his obligations under that contract, including payment of dues, entry in accordance with the Rules, and timely submission of his written response to the complaint against him, or his performance was excused.

90. NSCA breached that contract. The breaches were not technical departures from procedural detail; taken together they deprived Powell of the process the contract promised and of the benefit of his membership. They include, without limitation:

(a) adopting, ratifying, and giving continuing effect to a shoot-level disqualification imposed without the notice and "opportunity to be heard prior to disqualification" that Rule IV-F requires, and without the written record that rule requires be forwarded to the NSCA Director, rather than reviewing the disqualification against the requirements of Rule IV-F;

(b) accepting an unsigned protest, Exhibit 5, as a complaint against Powell, and considering it in reaching its ruling when Rule IV-D-2(g)(v) requires that a complaint bear the complainant's signature;

(c) considering and relying upon allegations of conduct "over the last several years," which no timely complaint under Rule IV-D-2(g) placed before the Council, and upon allegations offered on belief rather than personal knowledge;

(d) treating the shoot-level disqualification as establishing a violation and as a component of the discipline, contrary to Rule IV-D-2(g), which provides that "[t]he action of being disqualified from a shoot does not start disciplinary action";

(e) failing to attempt to obtain written statements from all known witnesses, including witnesses Powell expressly identified in his written response, as Rule IV-D-2(k) requires;

(f) failing to prepare or act upon a recommendation containing all evidence considered, a determination whether the alleged violation occurred, and the recommended discipline, as Rule IV-D-2(l) requires, and failing to issue a ruling stating the evidence considered and a determination of whether the alleged violation occurred, as Rule IV-D-2(n) requires;

(g) deciding the matter on evidence never disclosed to Powell — thirteen witness statements and information from the host club — which he was never permitted to see, answer, or test;

(h) imposing a composite sanction that the Rules' disciplinary scheme does not contemplate and that bears no reasonable relationship to the conduct properly before the Council, while imposing no sanction at all on other participants in the same conduct;

(i) affirming that sanction on September 25, 2026 without disclosing the witness statements or the host club's submission, without permitting confrontation of any witness, without making any record, and without stating the findings the Rules require;

(j) resting that affirmance in part on prior disciplinary matters that were not charged in Formal Complaint #26-10, of which Powell received no notice under Rule IV-D-2(g), and which he was given no opportunity to address; and

(k) failing to forward to Powell the supplemental materials received from Northbrook, so that he could review and address them, and then relying on those same materials in its ruling.

91. NSCA's discretion under Rules IV-D-1 and IV-D-2(n) does not excuse these breaches. Discretion as to the sanction is not discretion to disregard the mandatory procedures that condition its exercise, and Powell's agreement under Rule IV-B to accept NSCA's official decisions extends only to decisions reached in accordance with the Rules.

92. As a direct and proximate result of NSCA's breaches, Powell has sustained damages, including lost competition, purse, and options income; lost sponsorship and endorsement compensation and product benefits; lost instruction, clinic, and coaching income; lost appearance and demonstration fees; and injury to his professional standing, in amounts to be proven at trial and exceeding the jurisdictional minimum. Powell has no adequate remedy at law for the portion of his injury described in Section IV.I above and is entitled to injunctive relief.

93. Powell has retained the undersigned counsel, who are authorized to present this claim, and Powell has presented and hereby presents his claim to NSCA. Powell seeks his reasonable and necessary attorney's fees under sections 38.001(b)(8) and 38.002 of the Texas Civil Practice and Remedies Code, and pleads that more than thirty days will have elapsed after

presentment without tender of the just amount owed before judgment is sought on this claim. NSCA is an "organization" within the meaning of section 38.001(a) of the Texas Civil Practice and Remedies Code and section 1.002 of the Texas Business Organizations Code. NSCA is not a religious organization, a charitable organization, or a charitable trust within the meaning of section 38.001(b): it is a membership association organized to sanction and administer competitive shooting for adult competitors, it is not organized or operated exclusively for charitable, religious, educational, or youth sports or youth recreational purposes, and it is not a quasi-governmental entity authorized to perform a function by state law.

**COUNT II — Arbitrary and Capricious Action and Denial of Fundamental Fairness**

94. Powell pleads this Count to set out the standard under which NSCA's action is subject to judicial review notwithstanding the deference ordinarily afforded a voluntary association's internal affairs, and as an independent ground for declaratory and injunctive relief sought in Count IV. To the extent the Court concludes that the matters pleaded in this Count do not constitute a freestanding cause of action, Powell pleads them in support of, and incorporates them into, Counts I and IV.

95. A valuable pecuniary right is at stake. Membership in good standing is the precondition to Powell's ability to earn his living as a competitor and instructor, and the August 6, 2026 ruling withdraws it for more than a decade and withdraws the associated honors permanently. NSCA holds exclusive control over the registration of scores, classification, national averages, rankings, and All-American standing in the sport. A professional competitive record built over a career has value only within NSCA's system, and NSCA's ruling renders that record, and the earning capacity built on it, commercially worthless for the duration of the suspension. The

deprivation of the pecuniary benefits incident to membership is a civil and property right that Texas courts protect.

96. Texas law leaves a voluntary association free to manage its own internal affairs, but it does not insulate association action that is arbitrary or capricious, that transgresses the bounds of reason, that is contrary to public policy, or that denies a member the fundamental fairness — notice of the charges and a meaningful opportunity to be heard — that the association's exercise of discretion over a member's livelihood requires.

97. The August 6, 2026 ruling and the September 25, 2026 affirmance were arbitrary and capricious, and denied Powell fundamental fairness, in that:

(a) Powell was never given the evidence on which the Council relied. Thirteen witness statements and the host club's submission were considered; none was disclosed to him, summarized for him, or made available for response;

(b) Powell never confronted or questioned any adverse witness, never appeared before the Executive Council, and was afforded no hearing of any kind by the body that imposed the sanction;

(c) The Council did not obtain statements from all of the witnesses Powell named;

(d) Neither the August 6, 2026 ruling nor the September 25, 2026 affirmance states any findings. Neither says which allegations were sustained, what evidence was credited, or why the sanction followed. Neither Powell nor any reviewing body can test either decision against the record, because no record was made;

(e) The Council relied on assertions of conduct "over the last several years" that were offered on belief, were never particularized, and were never the subject of any timely complaint;

(f) The sanction is grossly disproportionate to the conduct properly before the Council — a mutual verbal dispute among squad members, already addressed by disqualification — and, on information and belief, to sanctions NSCA has imposed for equal or more serious conduct by others; and

(g) The Council imposed a career-ending sanction on one participant in a mutual dispute and no sanction at all on the others, including the participant who by the complainant's own account began it, and offered no explanation for the difference;

(h) The September 24, 2026 appeal hearing cured none of these defects. Powell appeared and testified, but the witness statements and the host club's submission were still withheld from him, no witness against him appeared or was subject to question, no record was made, and the affirmance that followed states no findings; and

(i) The Officers rested their affirmance in part on "the third disciplinary matter the NSCA has had to address with [Powell] since May 2025" — prior matters that Formal Complaint #26-10 did not charge, of which Powell had no notice, and which he had no opportunity to address before they were weighed against him.

98. These are not complaints about the technical application of a rule. Taken together, they describe an adjudication conducted from beginning to end without disclosure of the evidence, without confrontation, without any hearing before the body that imposed the sanction, without a record, and without findings at either stage, resulting in the destruction of the member's profession. That Powell was permitted to speak before the reviewing body on September 24, 2026 does not answer these defects; a hearing at which the accused still cannot see the evidence, still cannot question a witness, and still receives no findings is not the process the Rules promise or that Texas

law requires. NSCA thereby exceeded the bounds of reason, common sense, and fairness within which Texas law confines an association's discretion.

99. Powell is entitled to a judgment declaring the August 6, 2026 ruling and the September 25, 2026 affirmance void and unenforceable, to injunctive relief restraining their enforcement, and to damages in amounts to be proven at trial.

**COUNT III — Breach of the Implied Duty of Good Faith and Fair Dealing (Pleaded in the Alternative)**

100. Powell pleads this Count in the alternative to Counts I and II.

101. The relationship between NSCA and Powell is a special relationship. NSCA drafted the membership terms and offered them on a take-it-or-leave-it basis to an athlete who had no bargaining power over them; NSCA controls access to the only forum in which that athlete can practice his profession; and NSCA holds exclusive control over the initiation, investigation, adjudication, and review of the charges by which a member's livelihood is taken away. Those features — unequal bargaining power and one party's exclusive control over the process by which the other's rights are determined — are the features from which Texas law derives a duty of good faith and fair dealing.

102. NSCA breached that duty by exercising its disciplinary discretion arbitrarily and in bad faith, including by: singling Powell out for career-ending discipline arising from a mutual dispute while imposing no discipline on other participants, including the member who by the complainant's own account initiated the vulgar language and hull-throwing; relying on stale and belief-based allegations that no timely complaint placed before it; refusing to disclose the evidence against him or to permit any response to it; disregarding the exculpatory evidence and the rule violations committed against Powell; crediting an unadjudicated shoot-level disqualification as though it established guilt; imposing a sanction grossly disproportionate to the conduct properly

before it; affirming that sanction on appeal without curing any of these defects; and weighing against Powell, on appeal, prior disciplinary matters that were never charged and that he was never given an opportunity to answer.

103. As a direct and proximate result, Powell has suffered the injuries described above, for which he seeks damages and injunctive relief.

**COUNT IV — Declaratory Judgment, 28 U.S.C. §§ 2201–2202**

104. An actual, substantial, and justiciable controversy of sufficient immediacy and reality exists between Powell and NSCA concerning the validity and enforceability of the August 6, 2026 ruling and of the September 25, 2026 decision affirming it. Powell contends the ruling is void and unenforceable because it was taken in breach of the contract between the parties, was arbitrary and capricious, denied him fundamental fairness, and was imposed pursuant to and in furtherance of an unlawful restraint of trade and an unlawful maintenance of monopoly power. NSCA contends the ruling is valid and is enforcing it.

105. Powell is entitled to a declaration under 28 U.S.C. §§ 2201–2202 and Federal Rule of Civil Procedure 57 that the August 6, 2026 ruling and the September 25, 2026 affirmance are void and unenforceable, and that NSCA may not enforce the suspension, the recognition-team and Hall of Fame bans, or the probation imposed by that ruling. Powell further requests all necessary or proper relief based on that declaration under 28 U.S.C. § 2202.

**COUNT V — Monopolization and Attempted Monopolization in Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2**

106. The relevant markets are the market for the sanctioning of registered competitive sporting clays events in the United States and, in addition or in the alternative, the market for the services of professional competitive sporting clays athletes and instructors in the United States, each as described above.

107. NSCA possesses monopoly power in the sanctioning market. It sanctions substantially all registered sporting clays competition in the United States, no member may enter registered competition without its permission, it sets the price and terms of participation without competitive constraint, and entry by a rival is barred or substantially impeded for the reasons pleaded above. By virtue of that power, NSCA also controls entry into the market for the services of professional sporting clays athletes and instructors. That control extends beyond sanctioned competition itself. Member clubs depend on NSCA for the registered tournaments they must bid to host and from which they derive revenue, and they will not host, permit, or promote instruction by a suspended member for fear that NSCA will withdraw registered tournaments from them.

108. NSCA has willfully acquired and maintained that monopoly power through exclusionary conduct, and not as a consequence of a superior product, business acumen, or historic accident. That conduct includes, without limitation:

(a) adopting, imposing on a take-it-or-leave-it basis, and enforcing membership and termination policies that permit NSCA to end a member's participation in the only market in which his services can be sold, on evidence never disclosed to him, without a hearing, without findings, without any requirement of proportionality or even-handed treatment, and without effective review;

(b) defining a disciplinary offense to include conduct "harmful to the NSCA" itself, thereby converting a power justified by the integrity of competition into a power to protect the association's own position against criticism, challenge, and rival ventures;

(c) applying that power selectively and pretextually, as it did to Powell—ending the career of the competitor who had just won the event while imposing no sanction whatever on the other participants in the same conduct, including the member who by the complainant's

own account began it, and then affirming that result on review by a body drawn from the same membership—in a manner that signals to every member the cost of contesting NSCA's authority;

(d) refusing, on any terms, to permit an excluded member access to registered competition, though NSCA is the only source of such access and would be compensated for providing it; and

(e) leveraging its control over the award of registered tournaments to member clubs to extend the exclusion beyond sanctioned competition and into the market for instruction, so that member clubs, fearing the loss of registered tournaments, have refused to permit Powell to conduct clinics or have permitted him to coach only on the condition that he not advertise his clinics, thereby foreclosing Powell not only from competing but from selling his services as an instructor.

109. Access to NSCA-sanctioned competition is an input that Powell cannot practicably duplicate and without which he cannot compete at all. NSCA controls that access, is the only entity able to provide it, has denied it to Powell on terms it has applied to no similarly situated competitor, and faces no legitimate business impediment to supplying it—indeed, NSCA would receive Powell's dues and entry fees if it did.

110. In the alternative, NSCA has attempted to monopolize the markets described above. It has engaged in the exclusionary conduct pleaded above with the specific intent to acquire and maintain monopoly power, and there is a dangerous probability that it will succeed; indeed, it has already succeeded.

111. NSCA's conduct occurs in and substantially affects interstate commerce, as pleaded above.

112. As a direct and proximate result of NSCA's violation of Section 2 of the Sherman Act, competition has been injured in the ways pleaded above, and Powell has suffered injury to his business and property, including lost competition, purse, and options income; lost sponsorship, endorsement, and product-supply compensation; lost instruction, clinic, and coaching income; lost appearance and demonstration fees; and the loss of the professional standing on which those income streams depend, in amounts to be proven at trial.

113. Powell is entitled to recover threefold his damages, together with the costs of suit and reasonable attorney's fees, under Section 4 of the Clayton Act, 15 U.S.C. § 15, and to injunctive relief against NSCA's continuing violation under Section 16 of the Clayton Act, 15 U.S.C. § 26.

**COUNT VI — Contract, Combination, or Conspiracy in Restraint of Trade in Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1**

114. NSCA is an association of independently owned member clubs and of individual members who are actual or potential competitors of one another in the ways pleaded above. Its rules are the product of agreement among those separate economic actors, and its disciplinary rulings are the joint action of members who compete with the member disciplined.

115. NSCA, its member clubs, and members who compete with Powell entered into a contract, combination, or conspiracy in restraint of trade. The agreement consists of, without limitation: the adoption and maintenance of the membership and termination policies described above; the agreement of member clubs to honor NSCA suspensions and to exclude suspended members from registered competition and appearances, including, as to Powell, refusing to permit or allow advertisement of his clinics at member clubs; the disqualification imposed by Northbrook and ratified by NSCA; the August 6, 2026 ruling excluding Powell from registered competition for more than ten years and from recognition teams and the NSCA Hall of Fame permanently; and

the unanimous decision of the NSSA Officers on September 25, 2026 affirming that exclusion and declaring it final.

116. That agreement is a concerted refusal to deal with Powell. Competitors who together control access to a facility that a rival must have in order to compete have agreed to withhold it from him, on terms that afforded him no notice of the evidence, no hearing, and no findings, and while extending it to other participants in the same conduct. Such an agreement is unlawful per se, or under abbreviated review.

117. In the alternative, the agreement is an unreasonable restraint of trade under the rule of reason. NSCA and its members possess market power in the relevant markets pleaded above; the restraint produces the anticompetitive effects pleaded above; those effects are not offset by any legitimate procompetitive justification; and NSCA's legitimate interests in safety, sportsmanship, and competitive integrity could be achieved by substantially less restrictive means, including the disclosure, hearing, findings, proportionality, and even-handedness that NSCA's own Rules contemplate and that it withheld here.

118. The restraint affects and occurs in interstate commerce, as pleaded above.

119. As a direct and proximate result of the violation of Section 1 of the Sherman Act, competition has been injured in the ways pleaded above, and Powell has suffered injury to his business and property in the amounts described above, to be proven at trial. Powell is entitled to threefold his damages, costs of suit, and reasonable attorney's fees under 15 U.S.C. § 15, and to injunctive relief under 15 U.S.C. § 26.

## VII. Irreparable Injury And Demand For Injunctive Relief

120. The injury to Powell described herein is immediate, continuing, and irreparable: the loss of the 2026 NSCA U.S. Open and of the balance of the 2026 season; the loss of each

succeeding competitive season and of the remainder of a finite competitive career; the permanent loss of recognition-team and Hall of Fame eligibility; the destruction of professional reputation and goodwill; and the threatened permanent termination of his principal sponsorship. There is no alternative sanctioned venue at which he may compete. Much of this harm cannot be measured or compensated by a later award of money damages, and Powell has no adequate remedy at law.

121. An injunction would cause NSCA no cognizable harm. NSCA would simply continue to recognize Powell's membership as it did before August 6, 2026, and would receive his dues and entry fees.

122. Powell demands, after trial on the merits, a permanent injunction, including injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26. Powell's application for interim relief pending trial will be made by separate motion, as W.D. Tex. Local Rule CV-65 requires. The permanent injunction Powell seeks would enter an order:

- prohibiting NSCA, its officers, directors, employees, and agents, and all persons in active concert or participation with them who receive actual notice of the order, from enforcing or giving effect to the August 6, 2026 ruling and the September 25, 2026 affirmance against Powell, including the suspension of his NSCA membership;
- prohibiting NSCA from enforcing or giving effect to the permanent bans on Powell's eligibility for any NSCA recognition team, including the USA Sporting Clays Team and the NSCA FITASC Team, and for nomination to or induction into the NSCA Hall of Fame;
- prohibiting NSCA from enforcing or giving effect to the lifetime disciplinary probation imposed by the August 6, 2026 ruling;

- prohibiting NSCA from barring, and requiring NSCA to permit, Powell's participation as a member in good standing in NSCA-sanctioned competition; and
- requiring NSCA to restore and maintain Powell's NSCA membership in good standing.

123. Powell is willing to post such security as the Court may deem proper under Federal Rule of Civil Procedure 65(c) in connection with any interim relief.

## VIII. JURY DEMAND

124. Pursuant to Federal Rule of Civil Procedure 38(b), Powell demands a trial by jury on all issues so triable.

## IX. PRAYER FOR RELIEF

WHEREFORE, Plaintiff Brandon Powell respectfully requests that the Court:

a. enter a declaratory judgment under 28 U.S.C. §§ 2201–2202 that the August 6, 2026 ruling and the September 25, 2026 affirmance are void and unenforceable;

b. after trial enter a permanent injunction prohibiting NSCA and all persons in active concert or participation with it from enforcing or giving effect to the August 6, 2026 ruling and the September 25, 2026 affirmance, and requiring NSCA to restore and maintain Powell's membership in good standing;

c. adjudge that NSCA has violated Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2;

d. award Powell his actual damages in an amount to be proven at trial;

e. award Powell threefold the damages sustained by him, together with the costs of suit and reasonable attorney's fees, under Section 4 of the Clayton Act, 15 U.S.C. § 15;

f. enjoin NSCA's continuing violations of the Sherman Act under Section 16 of the Clayton Act, 15 U.S.C. § 26;

g. award Powell his reasonable and necessary attorney's fees under Tex. Civ. Prac. & Rem. Code § 38.001;

h. award Powell his costs of court and pre- and post-judgment interest as allowed by law; and

i. grant such other and further relief, at law or in equity, to which Powell may be justly entitled.

Respectfully submitted,

COKINOS | YOUNG
10999 IH-10 West, Suite 800
San Antonio, Texas 78230
(210) 293-8700 (Office)
(210) 293-8744 (Fax)

*By: /s/ Marshall B. Swanson*
Stephanie O'Rourke
State Bar No. 15310800
sorourke@cokinoslaw.com
Chance K. Decker
State Bar No. 24069502
cdecker@cokinoslaw.com
Marshall B. Swanson
State Bar No. 24098490
E-mail: MSwanson@cokinoslaw.com

And

THE LAW OFFICES OF STEPHEN A. HESS, P.C.
111 South Tejon, Suite 102
Colorado Springs, Colorado 80903
(719) 471-4516 (Office)
Stephen A. Hess
Bar No. 16899
Email: stephen@stephenahess.com
***(Admitted Pro Hac Vice)***

***ATTORNEYS FOR PLAINTIFF BRANDON POWELL***

**TABLE OF EXHIBITS**

| Exhibit | Document |
|---|---|
| 1 | Amended and Restated Bylaws, National Skeet Shooting Association |
| 2 | 2026 NSCA Governance Book |
| 3 | 2026 NSCA Rule Book (rev. 4-22-26) |
| 4 | Hitch Complaint (NSCA Formal Complaint #26-10) |
| 5 | Unsigned Northbrook Protest Letter |
| 6 | Powell Response |
| 7 | August 6, 2026 Suspension Letter |
| 8 | September 25, 2026 NSSA Officers Appeal Hearing Result Letter |

**CERTIFICATE OF SERVICE**

I certify that on October 26, 2026, a true and correct copy of the foregoing was served on counsel of record for Defendant via the Court's CM/ECF system and by electronic mail.

*/s/ Marshall B. Swanson*
Marshall B. Swanson